## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

SHYAM AGARWAL

CRIMINAL CASE NO.

1:17-cr-00043-TCB-RGV

## <u>MAGISTRATE JUDGE'S REPORT, RECOMMENDATION, AND ORDER</u>

Defendant Shyam Agarwal ("Agarwal") is charged in a one-count indictment with intent to distribute a Schedule I controlled substance, AB-PINACA, AB-CHMINACA, and XLR11, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C). [Doc. 1].[1] Agarwal has moved to suppress evidence obtained following a traffic stop that occurred on April 14, 2015. [Docs. 15 & 43]. After an evidentiary hearing held on November 30, 2017,[2] the parties filed post-hearing briefs on the motion. <u>See</u> [Docs.

---

[1] The listed document and page numbers in citations to the record refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF.

[2] <u>See</u> [Doc. 47] for the transcript of the evidentiary hearing. Citations to the evidentiary hearing transcript hereinafter will be referred to as "(Tr. at ___)." In addition, the government submitted exhibits during the hearing, which will be referred to as "(Gov. Ex. ___)," and Agarwal submitted an exhibit at the hearing, which will be referred to as ("Def. Ex. ___)."

48, 51, & 52].  For the reasons that follow, it is **RECOMMENDED** that Agarwal's

motions to suppress, [Docs. 15 & 43], be **DENIED**.

## I.  STATEMENT OF FACTS

In connection with an investigation centered on the distribution of synthetic

drugs in the Atlanta metropolitan area, Drug Enforcement Administration ("DEA")

Special Agent Sherezad Dunn ("Agent Dunn") met with a confidential source ("CS")

sometime in 2014.  (Tr. at 7, 23, 53).[3]  The CS was introduced to Agarwal via a third

party, who informed the CS that Agarwal was able to sell synthetic marijuana[4] to

interested buyers.  (Tr. at 7, 56).  Agent Dunn then instructed the CS to contact

Agarwal and inquire about obtaining synthetic marijuana.  (Tr. at 8).

During the first call, which was recorded and preserved,[5] the CS told Agarwal

that he had a buyer—Agent Dunn, acting in an undercover capacity—interested in

buying 2,000 small packets and 1,000 large packets of synthetic marijuana.  (Tr. at

---

[3] Agent Dunn testified that she was introduced to the CS by agents from another office, and the other agents informed her that the CS's "information was reliable."  (Tr. at 7, 23-25).

[4] Agent Dunn testified that synthetic marijuana is "a manmade recreational drug," which "usually comes in the form of a chemical which is sprayed onto a green leafy material and that traditionally is smoked."  (Tr. at 10).

[5] The conversations between the CS and Agarwal were in the language of Hindi.  (Tr. at 8).  Agent Dunn testified that she is fluent in Hindi.  (Tr. at 8-9).  These conversations were also transcribed and translated into English.  (Tr. at 9; Gov. Exs. 8 & 9).

9-10); see also (Gov. Ex. 8).  During the call, Agarwal and the CS referred to the synthetic marijuana as "chargers," and Agent Dunn testified that the reference to "chargers" was initiated by Agarwal.  (Tr. at 10-11, 25; Gov. Ex. 8).  Agarwal seemed surprised at the large amount requested, and he told the CS that he had already arranged to obtain 2,000 packets from his supplier and would have to ask for the additional 1,000 packets.  (Tr. at 11-12; Gov. Ex. 8 at 3).  Agarwal proposed to conduct the sale on Sunday, but the CS suggested they meet on Tuesday.  (Tr. at 12-13; Gov. Ex. 8 at 4-6).  At the end of the conversation, the CS asked Agarwal if his synthetic marijuana was the old one, and Agarwal said that it was "all good," and that the CS could open one or two packets to check.  (Tr. at 13-14, 29; Gov. Ex. 8 at 16-17).[6]  In a subsequent recorded call, Agarwal and the CS discussed whether the sale of the synthetic marijuana would happen on Sunday or Tuesday.  (Tr. at 15); see also (Gov. Ex. 9).  The CS explained that the supposed purchaser needed the extra time to collect the money for the purchase.  (Tr. at 15; Gov. Ex 9 at 3).  The CS and Agarwal ultimately agreed, in a later unrecorded phone call, to conduct the transaction on Tuesday.  (Tr. at 16, 27).[7]

---

[6] Agent Dunn testified that when the CS referred to the "old one," he meant "the illegal synthetic marijuana, [] the one[] that w[as] banned and illegal."  (Tr. at 14).

[7] Agent Dunn testified that Agarwal became suspicious of the CS's new telephone number, which was given to the CS once the investigation began, so the

Once the CS and Agarwal settled on the meeting date, DEA agents contacted a supervisor at the Georgia State Patrol ("GSP") to request assistance on the day of the drug deal. (Tr. at 16). GSP Trooper Jeremy Lipham ("Trooper Lipham") of the Criminal Interdiction Unit contacted Agent Dunn, and she asked him to attend the DEA briefing the morning of the scheduled buy between the CS and Agarwal. (Tr. at 16, 30-31, 63). On the morning of April 14, 2015, Trooper Lipham and GSP Trooper Nick Wilson ("Trooper Wilson") attended the DEA briefing and were informed that Agarwal and the CS were going to meet at a designated location, at which the CS would check to see if Agarwal had the synthetic marijuana, and that both the CS and Agarwal would drive to a second location, where the CS's buyer was supposed to be waiting, to drop off the synthetic marijuana and pick up the money. (Tr. at 17, 29, 31, 65-66, 97). Trooper Lipham was instructed to wait in the general area of the meeting, and once he was alerted that Agarwal was driving to the second location, Trooper Lipham would follow Agarwal's vehicle and eventually conduct a traffic stop. (Tr. at 17-18, 30-31). Agent Dunn requested that Trooper Lipham attempt to find an independent reason to stop Agarwal's vehicle, if possible, after his meeting with the CS. (Tr. at 30, 32).[8] At the time of the DEA

_____

calls could be recorded. (Tr. at 26-27).

[8] Agent Dunn explained that if Trooper Lipham could find a traffic violation or other legal reason to stop Agarwal's vehicle, it would help to preserve the larger

4

briefing on the morning of April 14, 2015, law enforcement was not aware of what make and model vehicle Agarwal would be driving. (Tr. at 18). Therefore, Trooper Lipham had to have "radio communication" with the DEA agents as the drug deal unfolded in order to learn the description of Agarwal's vehicle, as well as the timing of the transaction and the location of the vehicle in order to attempt to make the stop. (Tr. at 17-18).[9]

Later that day, Agent Dunn conducted surveillance near the CS and Agarwal's planned meeting spot. (Tr. at 18). Agent Dunn was also listening to DEA radio communications to stay apprised of Agarwal's activity. (Id.). Trooper Lipham was also in the area, receiving updates from the DEA agents, who were monitoring the scene. (Tr. at 17-18, 33-34, 67). Trooper Lipham testified that he typically stayed in touch with DEA agents during these type of operations via a DEA radio, and while he did not recall if his patrol car had a DEA radio that day, he did recall that

---

DEA investigation and the CS. (Tr. at 31, 36-37).

[9] Trooper Lipham estimated that he had participated in approximately 300 special operations with other agencies. (Tr. at 63). He explained that "99.9 percent of the time [he] would go to the briefing if it was an investigation that [he was] being [a] part of," (Tr. at 64), and at the briefings, he would typically receive a "description of what the case consist[ed] of, vehicle descriptions, what . . . the investigators kn[e]w about their target, photographs, [and] just pretty much everything that they [could] disclose of their investigation," (Tr. at 65). He testified that he attended the DEA briefing in his case, and although he did not recall many details of the briefing at the time of the evidentiary hearing, he did recall that he was informed that Agarwal "would have a large quantity of synthetic marijuana." (Tr. at 66, 72).

he had cellular telephones designated for communication with each particular agency or group. (Tr. at 66-67).

Agarwal and the CS both arrived at the predetermined location, which was a gas station close to Agarwal's home, on April 14, 2015. (Tr. at 18-19). Agarwal arrived driving a Toyota Sienna, (Tr. at 19-20), and asked the CS to leave the gas station and drive to Agarwal's nearby apartment complex, (Tr. at 18, 51). Agent Dunn saw Agarwal and the CS, in their respective vehicles, drive to the complex and park in parking spaces near a white Toyota Matrix. (Tr. at 19). She also saw three males standing outside the vehicles talking, and she then observed a cardboard box, which she believed contained synthetic marijuana, be moved from the white Toyota Matrix to Agarwal's vehicle. (Tr. at 19-20, 52-53, 57). Agent Dunn subsequently observed all three men return to their own vehicles and leave the apartment complex. (Tr. at 20). This was consistent with the plan previously established between the CS and Agarwal. (Tr. at 20-21). Via the DEA radio, Agent Dunn communicated that the vehicles were leaving the apartment complex, and she or another agent announced over the radio which vehicle Agarwal was driving. (Tr. at 21). After momentarily remaining at the scene, Agent Dunn drove in the same direction as Agarwal's vehicle. (Id.).

At this time, Trooper Lipham headed in the direction of Agarwal's vehicle. [Doc. 51 at 7].   Tooper Lipham followed Agarwal's vehicle, and as they were preparing to get onto the interstate, he observed that the driver's side brake light on the vehicle was not functioning. (Tr. at 68).[10]  While traveling north on Interstate 85, Trooper Lipham activated his blue lights to initiate a traffic stop.  (Gov. Ex. 10; Tr. at 68).   Agarwal pulled to the side of the road, and Trooper Lipham parked behind Agarwal's vehicle, exited his patrol car, and approached the passenger side window of Agarwal's vehicle.   (Tr. at 69; Gov. Ex. 1 at 00:53-00:59).   Trooper Lipham identified himself to Agarwal and told Agarwal why he had stopped his vehicle, and he asked for Agarwal's license, registration, and insurance. (Tr. at 69; Gov. Ex. 1 at 1:00-1:25).  It took several minutes for Agarwal to locate these documents, and as he was looking for them, Trooper Lipham asked him several questions, including if the Toyota Sienna was his vehicle, if he had been drinking, what he did for a living, if he was on probation or parole, and "why he was so nervous."  (Tr. at 70; Gov. Ex. 1 at 1:25-5:30).   Agarwal answered the questions, stating, among other

---

[10] Trooper Lipham observed that the brake light was out before he activated his blue lights and started the video recorder in his patrol car, but the faulty brake like is visible on the recording.  (Tr. at 68-69; Gov. Ex. 1 at 00:21).  At the evidentiary hearing, Trooper Lipham confirmed that he had also called out other violations over the radio when initiating the traffic stop, including failure to maintain lane and speeding, but he did not recall anything about those violations.  (Tr. at 69; Gov. Ex. 1 at 00:36-00:40).

things, that his brake light was loose, (Gov. Ex. 1 at 1:10); see also (Tr. at 74-75), and

that he owned a convenience store in Arkansas, (Gov. Ex. 1 at 3:15-3:35).  After about

four minutes, Agarwal handed all of the requested documents to Trooper Lipham,

who reviewed them, and asked Agarwal what was in the boxes in his back seat,

(Gov. Ex. 1 at 5:30-5:38), and Agarwal said that he had pills in them, but that he was

not a pharmacist, (Gov. Ex. 1 at 5:40-6:20).  Trooper Lipham then asked Agarwal to

step out of his vehicle to better communicate with Agarwal because Trooper Lipham

was having trouble hearing Agarwal due to loud road noise and a "slight language

barrier."  (Tr. at 70; Gov. Ex. 1 at 6:25-6:40).[11]

While Trooper Lipham was speaking with Agarwal outside the vehicle, he

could see "three very large cardboard boxes" in the Toyota Sienna.  (Tr. at 71, 93).

Agarwal told Trooper Lipham that sexual enhancement pills were inside the large

boxes in his vehicle and repeated that he was not a pharmacist.  (Tr. at 71-72, 93;

Gov. Ex. 1 at 6:46).  Trooper Lipham could also see that one of the cardboard boxes

inside Agarwal's vehicle was open and contained pills.  (Tr. at 72).  Based on his

training and experience, Trooper Lipham testified that items marketed as sexual

enhancement pills sometimes had their original contents removed and were refilled

---

[11] Although Trooper Lipham testified that there was "a slight language barrier," he explained that he was able to communicate with Agarwal and that he appeared to be fluent in English.  (Tr. at 71).

with controlled substances, including methamphetamine, heroin, cocaine, and synthetic marijuana.  (Id.).  He also testified that the information he received at the briefing with the DEA contributed to his level of suspicion because he was told Agarwal "would have a large quantity of synthetic marijuana," and he "didn't know if it was synthetic marijuana that was contained within those capsules in the large package."  (Id.).

Trooper Lipham left Agarwal standing beside his vehicle and returned to his patrol car to run a check on Agarwal's driver's license, insurance, and vehicle registration.  (Tr. at 73; Gov. Ex. 1 at 7:00).  Trooper Lipham also confirmed that his GPS location and video camera were working properly.  (Tr. at 74).[12] While Trooper Lipham was in his patrol car, Trooper Wilson arrived on the scene.  (Gov. Ex. 1 at 7:35).  After a few minutes, Trooper Lipham received the confirmation regarding Agarwal's license, tag, and insurance status.  (Tr. at 74; Gov. Ex. 1 at 10:26).  Trooper Lipham exited his patrol car, (Gov. Ex. 1 at 11:05), and approached Agarwal and asked if he had a bulb to fix the brake light, (Tr. at 75; Gov. Ex. 1 at 11:10-11:30).  Although he had earlier acknowledged that his brake light had a loose wire, Agarwal claimed that his brake light had never been out.  (Tr. at 75; Gov. Ex. 1 at

---

[12] Trooper Lipham explained that he was not in his usual patrol car, (Tr. at 66-67), and was not "familiar with [the car he was in], so [he] was making sure all the equipment was working like it was supposed to be," (Tr. at 74).

11:33).[13]  Trooper Lipham asked Agarwal where he got the pills and if the pills in his

vehicle were illegal, and Agarwal responded that they were legal in America.  (Tr.

at 76; Gov. Ex. 1 at 11:51-12:15).  Trooper Lipham then asked Agarwal if he cared if

he took a look at them, and Agarwal responded, "No," and "pointed at the vehicle."

(Tr. at 76-77); see also (Gov. Ex. 1 at 12:20).  Trooper Lipham went to Trooper

Wilson's patrol car to get a copy of a written consent to search form.  (Tr. at 77; Gov.

Ex. 1 at 12:26).  He obtained the form and returned to Agarwal, told him it was a

consent to search form that gave them permission to look at the stuff in his vehicle,

confirmed that Agarwal could understand and read English, and asked Agarwal to

read the form and, if he agreed with it, to sign it.  (Tr. at 78; Gov. Ex. 1 at 14:05-

14:30).

Agarwal signed the written consent to search form, (Tr. at 78; Gov. Ex. 1 at

15:04; Gov. Ex. 4), which had a time stamp of 12:35, (Tr. at 81; Gov. Ex. 4).[14]  While

---

[13] Trooper Lipham testified that Agarwal's statement that the brake light had
"never been out" contributed to his suspicion as he "felt [that] he was hiding
something in the rear of the vehicle" and that is why he was "now [] saying he
[could not] fix it."  (Tr. at 75).

[14] The consent to search specifically stated:

I, [] Agarwal, hereby grant my consent to [Troopers Lipham and
Wilson] of the Georgia State Patrol to search the following described
vehicle including luggage, containers, and contents of all.  This includes
the removal of any suspicious paneling or other vehicle components
and the least intrusive access to any constructed compartment used for

Trooper Wilson stood at the patrol car, Trooper Lipham searched Agarwal's vehicle and located three cardboard boxes, inside which he found what appeared to be synthetic marijuana in bags, as well as purported sexual enhancement pills. (Tr. at 80-81, 84, 98; Gov. Exs. 6 & 7); see also (Gov. Ex. 1 at 15:26-53:50). After gathering the evidence from Agarwal's vehicle, Trooper Lipham returned his license, gave him an inventory form listing everything that was taken, told him that anything that was not illegal would be returned to him, and allowed Agarwal to leave.[15] (Tr. at 84;

_____

the purposes of concealing contraband.

Year: 2002   Make: TOYOTA   Model: SIENNA   Color: BLU

Tag Number: R0NNY1   Tag State: GA

I understand that I have the right to refuse to consent to the search described above and to refuse to sign this form. I further state that no promises, threats, force, physical or mental coercion of any kind whatsoever have been used against me to get me to consent to the search described above or to sign this form.

My consent is freely and voluntarily given.

(Gov. Ex. 4).

[15] Trooper Lipham testified that whenever he found suspected synthetic marijuana, the individual was not arrested at that time, and the suspected synthetic marijuana was sent to the crime lab. (Tr. at 85). If it came back positive for synthetic marijuana, then an arrest warrant would be issued for that person. (Id.).

Gov. Ex. 1 at 2:40-4:30[16]).  At some point, Trooper Lipham also gave Agarwal a courtesy warning, with a time stamp of 12:33. (Tr. at 81; Gov. Ex. 10).[17]  Agent Dunn took possession of the synthetic marijuana seized from Agarwal's vehicle and sent it to the crime lab for testing.  (Tr. at 21); [Doc. 51 at 10].

## II.  DISCUSSION

Agarwal contends that "all evidence obtained pursuant to law enforcement's search of [his] vehicle should be suppressed because [] the initial traffic stop was made without any reasonable articulable suspicion that any crime had occurred; and [] troopers impermissibly extended the scope and duration of the traffic stop[.]" [Doc. 43 at 11].  The government responds that "law enforcement had probable cause to both stop and search . . . Agarwal's vehicle for contraband." [Doc. 51 at 1]. In particular, the government asserts that "Trooper Lipham had probable cause to stop Agarwal's vehicle based on the DEA investigation, as those facts are imputed to him via the collective knowledge doctrine" and that "even if probable cause did not exist based on the DEA investigation, there was at least reasonable suspicion to

---

[16] The video recording's time stamp stops at 56:47 and then starts back at 00:00, and records for another 4 minutes and 38 seconds.  See (Gov. Ex. 1).

[17] Trooper Lipham testified that he was not sure if the time indicated on the warning was when it was printed, and he stated that it "could be the time of the traffic stop" or the "time [his] camera [was] turned on."  (Tr. at 81).  He also testified that he did not recall when he actually handed the warning citation to Agarwal. (Id.).

stop Agarwal's vehicle, the length of the stop was reasonable under the Fourth Amendment, and [he] consented to the search of his vehicle." [Id. at 1-2].

## A.    Probable Cause to Initiate the Traffic Stop

"The Fourth Amendment protects individuals from unreasonable search and seizure." United States v. Rowls, 402 F. App'x 467, 468 (11th Cir. 2010) (per curiam) (unpublished) (citation and internal marks omitted). The "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." Whren v. United States, 517 U.S. 806, 809-10 (1996) (citations omitted); see also United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001); United States v. Edenilson-Reyes, Criminal Action File No. 1:09–CR–00361–RWS–AJB, 2010 WL 5620439, at *9 (N.D. Ga. Oct. 26, 2010), adopted by 2011 WL 195679, at *1 (N.D. Ga. Jan. 20, 2011).

A traffic stop is reasonable if the officer had probable cause to believe that a traffic violation has occurred, or if the traffic stop is justified by reasonable suspicion in compliance with Terry v. Ohio, 392 U.S. 1 (1968). Edenilson-Reyes, 2010 WL 5620439, at *9 (citing United States v. Spoerke, 568 F.3d 1236, 1248 (11th Cir. 2009); Purcell, 236 F.3d at 1277); see also United States v. Monzon-Gomez, 244 F. App'x 954, 959 (11th Cir. 2007) (per curiam) (unpublished); United States v. Simmons, 172

F.3d 775, 778 (11th Cir. 1999); <u>United States v. Sierra</u>, Cr. No. 2:10cr183–MEF, 2011 WL 1675217, at *2 (M.D. Ala. Apr. 19, 2011), adopted by 2011 WL 1675180, at *1 (M.D. Ala. May 4, 2011), <u>aff'd</u> by 501 F. App'x 900 (11th Cir. 2012) (per curiam) (unpublished).  Thus, "[a] traffic stop . . . is constitutional if it is either based upon probable cause to believe a traffic violation has occurred or justified by reasonable suspicion. . . ."[18]  <u>Edenilson-Reyes</u>, 2010 WL 5620439, at *9 (alterations in original) (citations and internal marks omitted); <u>see also</u> <u>United States v. Boyd</u>, 388 F. App'x 943, 947 (11th Cir. 2010) (per curiam) (unpublished); <u>United States v. Woods</u>, 385 F. App'x 914, 915 (11th Cir. 2010) (per curiam) (unpublished).  The government bears the burden of presenting facts to establish that the traffic stop is supported by reasonable suspicion or probable cause.  <u>See</u> <u>Welsh v. Wisconsin</u>, 466 U.S. 740, 749-50 (1984); <u>see also</u> <u>United States v. Kelly</u>, No. 1:13–cr–108–WSD–JSA, 2014 WL 1153375, at *8 (N.D. Ga. Mar. 21, 2014), adopted at *4 (citations omitted).

An officer's subjective intentions and motives are irrelevant where the officer has probable cause for the stop.  <u>See</u> <u>United States v. Mwangi</u>, Criminal File No.

---

[18] Probable cause must be supported by more than a mere suspicion, but does not require the same "'standard of conclusiveness and probability as the facts necessary to support a conviction.'"  <u>United States v. Dunn</u>, 345 F.3d 1285, 1290 (11th Cir. 2003) (quoting <u>Wood v. Kesler</u>, 323 F.3d 872, 878 (11th Cir. 2003)).  Reasonable suspicion is a less demanding standard than probable cause and requires only a fair probability that illegal activity has occurred.  <u>United States v. Sokolow</u>, 490 U.S. 1, 7 (1989).

1:09-CR-107-TWT, 2010 WL 520793, at *3 n.9 (N.D. Ga. Feb. 5, 2010), adopted at *1 (citations omitted); see also United States v. Arango, 396 F. App'x 631, 632-33 (11th Cir. 2010) (per curiam) (unpublished) (citation and internal marks omitted) ("Where objectively reasonable conditions permit a stop, the officer's motive in making the traffic stop does not invalidate what is otherwise objectively justifiable behavior under the Fourth Amendment."); Miller v. Harget, 458 F.3d 1251, 1260 (11th Cir. 2006) (citations omitted) ("It is well-settled that an officer's subjective motivations do not affect whether probable cause existed"); United States v. Jimenez, No. 2:06-cr-74-FtM-29DNF, 2006 WL 2927477, at *2 (M.D. Fla. Oct. 11, 2006) (holding that "an officer's belief that he has probable cause or does not have probable cause is simply not a pertinent factor" in determining whether an arrest is lawful).  That is, "if the driver of a car has broken a traffic law, no matter how relatively minor, a motion to suppress evidence cannot be based on the argument that the stop was pretextual."  United States v. Wright, No. CR210-022, 2010 WL 4967468, at *1 (S.D. Ga. Nov. 5, 2010), adopted by 2010 WL 4967838, at *1 (S.D. Ga. Dec. 1, 2010) (citation omitted).

In addition, "[t]he propriety of the traffic stop [] does not depend on whether the defendant is actually guilty of committing a traffic offense."  United States v. Sicairos-Sicairos, Criminal Action File No. 4:10–CR–054–HLM, 2011 WL 2710031, at

*5 (N.D. Ga. July 11, 2011) (citation omitted).  "Instead, the relevant question is whether it was reasonable for the officer to believe that a traffic offense had been committed."  Id. (citation omitted).

Agarwal argues that the traffic stop was not supported by probable cause or articulable suspicion.  [Doc. 43 at 13].  In particular, he asserts that "there simply is nothing substantiating [] Trooper[ Lipham's] claim [he] was speeding or failing to maintain his lane" and "it is clear [Trooper Lipham] did not notice [his] faulty brake light until after the stop had been initiated."  [Id.].

"Georgia law states that if a 'motor vehicle is manufactured with two brake lights, both must be operational.'"  United States v. Terry, 220 F. App'x 961, 963 (11th Cir. 2007) (per curiam) (unpublished) (quoting O.C.G.A. § 40-8-25(b)).  Trooper Lipham testified that the reason he stopped Agarwal's vehicle was because it had a brake light out.  (Tr. at 68).  Contrary to Agarwal's assertion, Trooper Lipham testified that he observed that Agarwal's brake light was out before he initiated the stop.  (Id.).  Agarwal has made "no showing [] that the taillight of [his] vehicle was operational on April [14, 2015], and, therefore, no evidence that [Trooper Lipham's] testimony is not entitled to deference."  United States v. Mackey, 149 F. App'x 874, 879 (11th Cir. 2005) (per curiam) (unpublished).  Based on this uncontradicted

testimony, Trooper Lipham "had probable cause to stop [Agarwal] on the basis that he was violating [a] traffic regulation[]." Terry, 220 F. App'x at 963.

Trooper Lipham's testimony established that he had probable cause to believe that Agarwal had violated Georgia law, which is "all that is necessary to conduct a traffic stop." United States v. Alvardo, No. 8:10-CR-348-T-30TGW, 2010 WL 5262736, at *5 (M.D. Fla. Nov. 17, 2010), adopted by 2010 WL 5262735, at *1 (M.D. Fla. Dec. 17, 2010) (citing Whren, 517 U.S. at 810).  Having considered the evidence and testimony presented at the evidentiary hearing, the "Court finds [Trooper Lipham's] testimony [that he observed that Agarwal's brake like was out] reliable and credible." United States v. Abarca, Case No. 1:12cr29-MW/GRJ, 2014 WL 12641951, at *6 (N.D. Fla. Nov. 20, 2014); see also United States v. Pineiro, 389 F.3d 1359, 1366 (11th Cir. 2004) (recognizing that credibility determinations are "within the province of the factfinder").  Therefore, Trooper Lipham had probable cause to stop Agarwal.[19]

---

[19] Because the Court finds that Trooper Lipham had probable cause to initiate the traffic stop of Agarwal's vehicle based on his observation of the brake light being out, the Court need not address Agarwal's assertion that there is nothing to substantiate Trooper Lipham's statement that claimant was speeding and failing to maintain his lane.  [Doc. 43 at 12-13]; (Gov. Ex. 1).

**B.**     **Scope and Duration of the Traffic Stop**

Agarwal next contends that "[e]ven if this Court finds that the initial traffic stop was valid, the evidence derived from it must still be suppressed because it was obtained directly as a result of the troopers unlawfully extending the scope and duration of the stop." [Doc. 43 at 13]. Specifically, Agarwal asserts that Troopers Lipham and Wilson "unreasonably expanded the scope and duration of a simple traffic stop that was completed by extensively questioning [him] about the contents of his car," [id. at 16], that they "lacked the requisite suspicion that [he] was involved in drug related conduct to extend the scope and duration of the stop," [Doc. 48 at 1], and that the government "cannot avail itself of the collective knowledge theory to establish the necessary probable cause to validate the expanded scope of Trooper Lipham's search," [id. at 9]; see also [Doc. 52 at 3-9].

Even though an officer may have justification to initiate a traffic stop, the ensuing detention of a vehicle's occupant must not be excessively intrusive in that the officer's actions "must be 'reasonably related in scope to the circumstances which justified the interference in the first place.'" United States v. Boyce, 351 F.3d 1102, 1106 (11th Cir. 2003) (quoting Terry, 392 U.S. at 20); see also United States v. Cantu, 227 F. App'x 783, 785 (11th Cir. 2007) (per curiam) (unpublished). The stop must be of limited duration and "the stop may not last any longer than necessary to

process the traffic violation unless there is articulable suspicion of other illegal activity." <u>United States v. Garcia</u>, 284 F. App'x 791, 794 (11th Cir. 2008) (per curiam) (unpublished) (citation and internal marks omitted).  The duration of the traffic stop "must be limited to the time necessary to effectuate the purpose of the stop." <u>Purcell</u>, 236 F.3d at 1277 (quoting <u>United States v. Holloman</u>, 113 F.3d 192, 196 (11th Cir. 1997) (per curiam)).   "Asking questions while in the process of writing out a citation or awaiting the response of a computer check, however, does not extend the duration or scope of a valid initial seizure." <u>Garcia</u>, 284 F. App'x at 794 (citing <u>Purcell</u>, 236 F.3d at 1279-80); <u>see also</u> <u>United States v. Acosta</u>, 807 F. Supp. 2d 1154, 1196-97 (N.D. Ga. 2011), adopted at 1169 (footnote and citations omitted) ("The duration of a traffic stop may be prolonged to investigate, by the use of computer checks, the driver's license and the vehicle registration and, for officer's safety, the criminal history of the driver.").  In fact, "[t]he officer can lawfully ask questions, even questions not strictly related to the traffic stop, while waiting for a computer check of registration or examining a driver's license so long as it does not prolong beyond the time reasonably required to complete that mission." <u>Cantu</u>, 227 F. App'x at 785 (alteration, citation, and internal marks omitted).[20]  "When examining the

_____

[20] That is, "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." <u>Arizona v. Johnson</u>, 555 U.S. 323, 333 (2009) (citation omitted).

reasonableness of a traffic stop, the length of time before consent is given to search is also relevant." Garcia, 284 F. App'x at 794 (citation omitted). "Ordinarily, when a citation or warning has been issued and all record checks have been completed and come back clean, the legitimate investigative purpose of the traffic stop is fulfilled." Edenilson-Reyes, 2010 WL 5620439, at *10  (citation and internal marks omitted).

"However, a traffic stop may last longer than the purpose of the stop would ordinarily permit if an officer, based on specific facts and rational inferences drawn from those facts in light of his training and experience, has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring." United States v. DeJesus, 435 F. App'x 895, 900 (11th Cir. 2011) (per curiam) (unpublished) (citations omitted).  That is, "[a]n investigative stop can grow out of a traffic stop so long as the officer has reasonable suspicion of criminal activity to expand his investigation, even if his suspicions were unrelated to the traffic offense that served as the basis of the stop." United States v. Gomez Serena, 368 F.3d 1037, 1041 (8th Cir. 2004) (citation omitted).  As the Supreme Court has held, "[a] seizure justified only by a police-observed traffic violation . . . become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission of issuing a ticket for the violation," absent either reasonable suspicion or consent. Rodriguez v. United

States, 135 S. Ct. 1609, 1612-13 (2015) (all but first alteration in original) (citation and internal marks omitted).

Trooper Lipham had a valid basis for stopping Agarwal's vehicle based on the traffic violation he observed. Trooper Lipham exited his patrol vehicle, he told Agarwal why he had stopped him, and he asked for his license, registration, and insurance. (Tr. at 69; Gov. Ex. 1 at 00:45-1:25). While Agarwal was looking for these documents, Trooper Lipham asked several questions, including if the Toyota Sienna was his vehicle, if he had been drinking, what he did for a living, if he was on probation or parole, and why he was nervous. (Tr. at 70; Gov. Ex. 1 at 1:25-5:30). Agarwal handed his documents to Trooper Lipham, and while he was reviewing them, Trooper Lipham asked Agarwal what the boxes in his vehicle contained, and Agarwal responded that they contained pills. (Gov. Ex. 1 at 5:30-5:45, 5:55-6:00). Trooper Lipham then asked Agarwal if his address on his driver's license was correct and if he was a licensed pharmacist. (Gov. Ex. 1 at 5:45-6:20). As evidenced by the video recording, Trooper Lipham indicated that he had difficulty hearing Agarwal, see (Gov. Ex. 1), and asked him to step out of his vehicle so they could better communicate, (Tr. at 70; Gov. Ex. 1 at 6:25-6:40).[21]

---

[21] Trooper Lipham testified that he had trouble hearing Agarwal while he was seated in his vehicle due to the loud road noise and a slight language barrier. (Tr. at 70). When officers are conducting a valid traffic stop, they may lawfully order the suspect to exit the vehicle. Maryland v. Wilson, 519 U.S. 408, 414-15 (1997);

While speaking outside the vehicle, Agarwal again stated that the boxes contained pills, that they were for sexual enhancement, and that he was not a pharmacist. (Tr. at 71-72, 93; Gov. Ex. 1 at 6:46). Trooper Lipham then went back to his patrol car to run a check on Agarwal's driver's license, insurance, and vehicle registration. (Tr. at 73; Gov. Ex. 1 at 7:00). After receiving confirmation regarding his license, registration, and insurance several minutes later, Trooper Lipham exited his patrol car, (Gov. Ex. 1 at 11:05), and asked Agarwal if he had a bulb to fix the brake light and then asked where he got the pills and if they were legal, to which Agarwal responded that they were legal in America, (Tr. at 75-76; Gov. Ex. 1 at 11:10-12:15). Approximately twelve minutes into the traffic stop, Trooper Lipham asked if Agarwal cared if he took a look at the boxes, and Agarwal responded, "No," and pointed at the vehicle. (Tr. at 76-77; Gov. Ex. 1 at 12:20). Trooper Lipham obtained a consent to search form and explained to Agarwal that the form gave them permission to look at the items in his vehicle. (Tr. at 77; Gov. Ex. 1 at 12:26-14:20). He asked Agarwal to read the form and sign it if he agreed, and Agarwal consented to the search by signing the form. (Tr. at 77-78; Gov. Ex. 1 at 14:21-15:04;

---

Pennsylvania v. Mimms, 434 U.S. 106, 110-11 & n.6 (1977) (per curiam) (holding that concern for a police officer's safety outweighed the slight intrusion on a motorist's liberty when the police officer, who had no reason to believe the motorist was armed or dangerous, directed the motorist stopped for a minor traffic infraction to step out of his vehicle); see also United States v. Swann, No. 4:14–mj–0102–MSH, 2014 WL 6605610, at *3 (M.D. Ga. Nov. 20, 2014).

Gov. Ex. 4).   Trooper Lipham searched Agarwal's vehicle and located three cardboard boxes inside, containing what he believed to be synthetic marijuana in bags in addition to purported sexual enhancement pills.  (Tr. at 80-81, 84, 98; Gov. Exs. 6 & 7; Gov. Ex. 1 at 15:26-53:50).

Agarwal "consented to a search of his car approximately [twelve] minutues into the traffic stop," and "[t]hese initial [twelve] minutes, therefore, are the only ones relevant to a determination whether the duration of the traffic stop was reasonable."   Purcell, 236 F.3d at 1279 (footnote omitted).   The period of approximately twelve minutes that elapsed between the initial stop and his verbal consent to search was not unreasonable.  See United States v. Burrows, 564 F. App'x 486, 490-91 (11th Cir. 2014) (per curiam) (unpublished) (alteration in original) (citation omitted) (noting the court's "'doubt that a [traffic stop] seizure of no more than seventeen minutes can ever be unconstitutional on account of its duration: the detention is too short'" and finding that because "only 12 minutes passed between the beginning of the traffic stop and the drug dog's alert," defendant had "not shown a Fourth Amendment violation"); United States v. Sampson, 388 F. App'x 950, 952 (11th Cir. 2010) (per curiam) (unpublished) (finding "a fifteen to twenty minute total stop was not unreasonable because the officers acted diligently"); Purcell, 236 F.3d at 1279 (citations omitted) (finding fourteen minutes was not an

unreasonable duration for a traffic stop and noting that the Eleventh Circuit had "approved traffic stops of much longer duration").

During the approximately twelve minutes between the initial stop and Agarwal's verbal consent to search the vehicle, as the government points out, "Trooper Lipham diligently [pursued] his investigation."  [Doc. 51 at 27].  In particular, Trooper Lipham asked for Agarwal's driver's license, registration, and insurance, and after Agarwal located these documents and handed them to him, Trooper Lipham reviewed them and asked Agarwal to step out of the vehicle.  See (Gov. Ex. 1 at 1:00-6:25; Tr. at 69-70).  Trooper Lipham then returned to his patrol car to check Agarwal's driver's license, registration, and insurance.  (Tr. at 73; Gov. Ex. 1 at 7:00).  After he finished, Trooper Lipham approached Agarwal and asked him about his brake light and the pills in his vehicle, and then asked him for consent to search, and Agarwal consented orally, (Tr. at 75-77; Gov. Ex. 1 at 11:10-12:20), and then in writing, (Tr, at 78; Gov. Ex. 1 at 14:05-15:04; Gov. Ex. 4); see also United States v. Sanchez, 417 F.3d 971, 975 (8th Cir. 2005) (citations omitted) (noting that a reasonable traffic stop investigation includes checking the driver's license, the vehicle's registration, inquiring about the occupants' destination, route, and purpose, and verifying the driver's story with passengers).

Even though some of the questions that Trooper Lipham asked were not related to the traffic stop for a faulty brake light, he posed most of these questions while Agarwal was looking for the documents necessary to complete the traffic stop, and given that only approximately twelve minutes passed from the initial stop until Agarwal verbally consented to the search of his vehicle, the Court finds that his asking of unrelated questions "did not unreasonably prolong the traffic stop," Burrows, 564 F. App'x at 491 (finding that questions unrelated to the traffic stop asked during the 12-minute duration before the dog alerted did not unreasonably prolong the stop); see also United States v. Barker, 644 F. App'x 1000, 1002 (11th Cir. 2016) (per curiam) (unpublished) (citations omitted); Johnson, 555 U.S. at 333 (citation omitted) ("An officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquires do not measurably extend the duration of the stop."); United States v. Trevino, Criminal Case No. 1:13-CR-0324-01-SCJ, 2015 WL 859386, at *8 (N.D. Ga. Feb. 27, 2015), adopted at *1 (finding "questions posed to [d]efendant unrelated to the stop were not improper and did not prolong the stop"), particularly in light of the fact that Trooper Lipham's "unrelated questions did not take very long to ask or answer, and [for over four minutes, Agarwal was looking for his license, registration, and insurance] as [Trooper Lipham] asked these

questions," <u>Burrows</u>, 564 F. App'x at 491; <u>see also</u>  <u>United States v. Iturbe-Gonzalez</u>,

100 F. Supp. 3d 1030, 1037-38 (D. Mont. 2015), <u>aff'd</u>, 705 F. App'x 486 (9th Cir. 2017)

(unpublished).[22]

---

[22] Agarwal argues that the "traffic stop investigation concluded once [Trooper Lipham] completed the warning citation for the faulty brake light," and that the "warning citation shows a time of completion of 12:33 p.m., just 9 minutes after the stop was initiated."  [Doc. 43 at 18 (footnote omitted)].  However, contrary to Agarwal's assertion, Trooper Lipham did not receive information back from the check that he ran on Agarwal's license, tag, and insurance until after Agarwal claims the traffic stop was already completed, <u>see</u> (Tr. at 74; Gov. Ex. 1 at 10:26), and did not again exit his patrol car after returning to it until approximately eleven minutes into the traffic stop, (Gov. Ex. 1 at 11:00), at which time he approached Agarwal and asked if he could fix the brake light by hitting it or if he had a replacement bulb, (Gov. Ex. 1 at 11:10-11:52; Tr. at 75).  Trooper Lipham then asked claimant where he obtained the pills, whether they were legal, and whether he cared if he took a look at them, and Agarwal consented, at which time it appears from the recording that Trooper Lipham had not given Agarwal the warning or returned his driver's license, insurance, or registration.  (Gov. Ex. 1 at 11:52-12:20); <u>see also</u> <u>DeJesus</u>, 435 F. App'x at 900 (noting that the "legitimate investigative purpose of the stop was not completed until [the officer] returned to [defendant's] vehicle with a warning citation and informed him that the traffic stop was over").  In addition, it is not clear when Trooper Lipham finished issuing the warning citation because, while Agarwal points to the time stamp as indicating the time that the warning was completed, Trooper Lipham testified that he was not sure if that time was when the ticket would have been printed.  (Tr. at 81).  Even were the Court to conclude the traffic stop was completed at the time Trooper Lipham determined Agarwal's brake light could not be fixed, the Court "do[es] not believe that the very brief period of time (approximately 30 seconds) that elapsed between the [time Trooper Lipham determined the faulty brake light could not be repaired] and [Agarwal's] oral consent to a search of his vehicle is sufficiently long to turn a completed traffic stop into an illegal detention[.]"  <u>United States v. Simms</u>, 385 F.3d 1347, 1354 (11th Cir. 2004) (footnote omitted).  Thus, Agarwal's assertion is without merit.

Agarwal argues that although he "did sign a consent form giving the trooper's consent to search his vehicle," his consent was involuntary.  [Doc. 43 at 19].  The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  "It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is 'per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'"  Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) (quoting Coolidge v. New Hampshire, 403 U.S. 443, 454-455 (1971); Katz v. United States, 389 U.S. 347, 357 (1967)).  "One of the well-established exceptions to the probable cause and warrant requirements is a search which is conducted pursuant to voluntary consent."  United States v. Garcia,  890 F.2d 355, 360 (11th Cir. 1989).  "An officer conducting a routine traffic stop may request consent to search the vehicle."  United States v. Harris, 526 F.3d 1334, 1339 (11th Cir. 2008) (per curiam) (citation and internal marks omitted).

"In order for consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice."  Garcia, 890 F.2d at 360.  "[T]he principles for determining the voluntariness of consent for a search are the same as those for determining the voluntariness of a confession– i.e. whether

consent is voluntary turns on questions of fact, determinable from the totality of the circumstances."  United States v. Boskic, Criminal No. 04-10298-DPW, 2006 WL 1540488, at *19 (D. Mass. June 2, 2006), aff'd, 545 F.3d 69 (1st Cir. 2008) (citation and internal marks omitted); see also United States v. Tovar-Rico, 61 F.3d 1529, 1535 (11th Cir. 1995) (noting voluntariness of consent is judged in light of the totality of the circumstances).   Relevant factors include the presence of coercive police procedures, the extent of the person's cooperation with the officer, the person's awareness of his right to refuse consent, the person's education and intelligence, and the person's belief that no incriminating evidence will be found.  Purcell, 236 F.3d at 1281; see also United States v. Chaidez-Reyes, Criminal Action No. 1:13-CR-158-ODE-AJB, 2014 WL 547178, at *15 (N.D. Ga. Feb. 10, 2014), adopted at *1. Ultimately, the burden is on the government to prove that the consent was given voluntarily.  United States v. Bentley, 151 F. App'x 824, 827 (11th Cir. 2005) (per curiam) (unpublished) (quoting United States v. Chemaly, 741 F.2d 1346, 1352 (11th Cir. 1984)); Tovar-Rico, 61 F.3d at 1536 (quoting Florida v. Royer, 460 U.S. 491, 497 (1983)); United States v. Blake, 888 F.2d 795, 798 (11th Cir. 1989).

Trooper Lipham testified that Agarwal voluntarily consented to the search of his vehicle both verbally and in writing.  (Tr. at 76-78; Gov. Ex. 4).  Trooper Lipham's testimony was consistent with the video of the traffic stop, in which he asked if

28

Agarwal cared if he took a look at the boxes in his vehicle, and Agarwal consented verbally, without any hesitation, by stating he did not, and then in writing, by signing the consent to search form. (Gov. Ex. 1 at 12:20-15:04). The video also shows that Trooper Lipham used a casual, conversational tone, did not draw his weapon, did not use physical force or restrain Agarwal, and had not threatened him in any way, but simply asked Agarwal if they could search his vehicle, and Agarwal orally and verbally consented. See (Gov. Ex. 1 at 12:20-15:04; Gov. Ex. 4); see also United States v. Zapata, 180 F.3d 1237, 1242 (11th Cir. 1999) (alterations in original) (citation omitted) ("'[T]he absence of intimidation, threats, abuse (physical or psychological), or other coercion is a circumstance weighing in favor of upholding what appears to be a voluntary consent.'").

"Considering the totality of these facts and circumstances, and comparing this encounter to more coercive circumstances that have nonetheless been found to be consensual, the Court finds that [Agarwal] freely and voluntarily consented to a search of the [vehicle]." United States v. Rodriguez-Alejandro, 664 F. Supp. 2d 1320, 1338 (N.D. Ga. 2009), adopted at 1326 (citations omitted); see also United States v. Brown, 223 F. App'x 875, 880 (11th Cir. 2007) (per curiam) (unpublished) (finding consent to search voluntary despite the fact that officer had drawn his weapon and placed defendant in handcuffs); United States v. Hidalgo, 7 F.3d 1566, 1567, 1571

(11th Cir. 1993) (finding consent voluntary where defendant was arrested by law

enforcement who had broken into his home early in the morning, woke him up, and

forced him to the ground at gun point); <u>Garcia</u>, 890 F.2d at 361 (holding consent

voluntary where defendant was arrested by numerous officers, was patted down for

weapons, was handcuffed, and where the officers refused to accept defendant's

conditional consent to search and threatened to obtain a search warrant if he did not

consent to a full search).  Additionally, "once [Agarwal] gave [the Troopers] consent

to search his [vehicle], he also provided consent to prolong the traffic stop."  <u>United

States v. Lamela-Cardenas</u>, Criminal Action No. 1:11-00122-KD-C, 2011 WL 3494562,

at *7 (S.D. Ala. Aug. 10, 2011) (citation omitted).[23]

Agarwal "did not limit the scope of [his] [verbal or written] consent, nor did

[he] object when [Trooper Lipham] searched [his] [boxes], indicate that []he had not

given consent to search [his] [boxes], or indicate that [Trooper Lipham] should not

---

[23] Agarwal appears to contend that the scope of his initial consent was exceeded because Trooper Lipham "only requested consent to look at the pills," [Doc. 43 at 6 n.22], and that despite looking through the box that contained the pills, for which he had been granted consent, he opened the other boxes as well, [<u>id.</u> at 6]. While Trooper Lipham may have initially asked to "look at them," arguably referencing the pills that Agarwal had been talking about, and then stated that the consent to search form was giving the troopers permission to look at the "stuff" and pills, (Gov. Ex. 1 at 12:20, 14:05-14:30), Agarwal, after reading the form, signed the consent to search form, which granted consent to the troopers to "search the . . . vehicle including luggage, containers, and contents of all," (Gov. Ex. 4).  Thus, Agarwal gave consent in writing to the search of his vehicle and all of the boxes therein.

search [his] [boxes]." United States v. Maloch, Criminal Action No. 2:14-CR-00014-RWS, 2015 WL 1888450, at *9 (N.D. Ga. Apr. 14, 2015), adopted at *1.  In fact, from the moment Trooper Lipham began interacting with Agarwal, Agarwal cooperated, and during the search, he did not voice any objections, nor did he rescind his consent in any way.  See generally (Gov. Ex. 1).  "Under these circumstances, the [Court] finds that [Trooper Lipham] reasonably interpreted the scope of [Agarwal's] consent to include the [all of the boxes] located in the [vehicle]." Maloch, 2015 WL 1888450, at *9 (citations omitted); see also United States v. Najera-Perez, Civil Action No. 1:12-CR-232-2-CAP, 2014 WL 888651, at *25 (N.D. Ga. Mar. 6, 2014), adopted at *1 (citation omitted) (holding where defendant gave unrestricted consent to search vehicles, it was "reasonable for law enforcement officers to interpret [d]efendant's unlimited consent to encompass compartments within [d]efendant's vehicles"); United States v. Edwards, Criminal Action File No. 1:10-CR-132-RWS/AJB, 2010 WL 5184784, at *7 (N.D. Ga. Oct. 13, 2010), adopted by 2010 WL 5276983, at *1 (N.D. Ga. Dec. 15, 2010) (finding that where the defendant's consent was "not limited in anyway" the general consent to search extended to papers found in the vehicle).  Accordingly, Agarwal voluntarily consented to the extension of the lawful traffic stop to allow the search of his vehicle, and since the April 14, 2015, traffic stop and subsequent detention and search were lawful, it is **RECOMMENDED** that

Agarwal's motions to suppress evidence arising from the traffic stop, [Docs. 15 &

43], be **DENIED**.

## C.   <u>Probable Cause to Search the Vehicle</u>

The Court also finds that the warrantless search of Agarwal's vehicle was

supported by probable cause to believe it contained contraband.   "Under the

automobile exception, agents may conduct a warantless search of a vehicle if (1) the

vehicle is readily mobile (i.e., operational); and (2) agents have probable cause to

believe the vehicle contains contraband or evidence of a crime."   <u>United States v.</u>

<u>Tamari</u>, 454 F.3d 1259, 1261 (11th Cir. 2006).   "The legality of a warrantless

automobile search is based on the existence of probable cause to believe that the

automobile is carrying contraband subject to forfeiture under the law, and the

difficulties of securing a moveable vehicle while a warrant is obtained."   <u>United</u>

<u>States v. Thomas</u>, 536 F. Supp. 736, 742 (M.D. Ala. 1982); <u>see also</u> <u>Chambers v.</u>

<u>Maroney</u>, 399 U.S. 42, 51-52 (1970); <u>United States v. Alexander</u>, 835 F.2d 1406, 1409

(11th Cir. 1988).

Probable cause to search exists "'when the facts and circumstances would lead

a reasonably prudent [person] to believe that the vehicle contains contraband.'"

<u>Alexander</u>, 835 F.2d at 1409 (alteration in original) (quoting <u>United States v. Clark</u>,

559 F.2d 420, 424 (5th Cir. 1977)[24]).  In determining whether probable cause exists, the Court "may examine the collective knowledge of the officers 'if they maintained at least a minimal level of communication during their investigation.'" United States v. Olmedo, 552 F. Supp. 2d 1347, 1357 (S.D. Fla. 2008) (quoting United States v. Willis, 759 F.2d 1486, 1494 (11th Cir. 1985)).  Thus, under the automobile exception, a warrantless search of a vehicle does not violate the Fourth Amendment 'if the vehicle is operational and 'under the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found' in the vehicle." Tamari, 454 F.3d at 1262 (quoting United States v. Goddard, 312 F.3d 1360, 1363 (11th Cir. 2002)).

The collective knowledge of the DEA agents and the participating troopers at the time of the traffic stop included the communications between the CS and Agarwal to arrange for the purchase of synthetic marijuana on April 14, 2015, and that the DEA agents, including Agent Dunn, observed the CS meet with Agarwal at the planned location, then travel to Agarwal's nearby apartment complex, where a box was moved from a vehicle at the complex to the vehicle Agarwal was driving, and then the vehicles left the complex and were believed to be traveling to meet the

---

[24] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981.

prospective buyer, which provided probable cause to believe that synthetic marijuana would be found in Agarwal's vehicle.  See United States v. Hernandez, 17 F. Supp. 3d 1255, 1260 (N.D. Ga. 2014) (citations omitted) (finding where "the officers with knowledge of the investigation [], in effect directed [another officer], who was aware of a bare minimum information of the facts of the federal investigation, to conduct a traffic stop if feasible based on [the officer's] reasonable suspicion of [d]efendant's prostitution activity" were circumstances "sufficient to trigger the collective knowledge doctrine"); see also Olmedo, 552 F. Supp. 2d at 1357.

While Agarwal argues at length that the government "did [not] present any evidence what-so-ever that Trooper Lipham possessed the minimal communication with the DEA agents–or any other law enforcement officers with knowledge of the operation–necessary to impute to him sufficient collective knowledge to provide him with a reasonable suspicion of a drug related offense," [Doc. 48 at 2]; see also [id. at 7-9; Doc. 52 at 1-8], the Court finds that the DEA agents and troopers "involved in this investigation maintained more than a minimal level of communication during the events on [April 14, 2015]," Olmedo, 552 F. Supp. 2d at 1357.  Agent Dunn supervised the investigation; she contacted GSP to request assistance on the scheduled date of the transaction; she asked Trooper Lipham to attend the DEA

briefing on the morning of the scheduled buy, at which he was instructed to wait in the general area of the meeting, and once alerted, to follow Agarwal, who he was told would have a large quantity of synthetic marijuana, and conduct a traffic stop; that Agent Dunn, along with other agents, participated in the surveillance of Agarwal on that day; and that Trooper Lipham was in communication, either via radio or cell phone, with the DEA agents on that day, in order to learn the description of Agarwal's vehicle and the timing and location of the transaction and movement of the vehicle in order to make the traffic stop.  (Tr. at 16-21, 29-31, 33-34, 63, 65-67, 97).  "This degree of communication is certainly more than 'minimal,' and the collective knowledge doctrine therefore applies." United States v. Goldenshtein, Criminal Case No. 1:10-CR-00323-TCB-RGV, 2011 WL 1321573, at *12 (N.D. Ga. Feb. 22, 2011), adopted by 2011 WL 1257147, at *1 (N.D. Ga. Apr. 1, 2011) (citation omitted).

"Under the totality of the circumstances, [Trooper Lipham] had probable cause to search [Agarwal's vehicle] and to seize the [boxes] located within the [vehicle]." Rodriguez-Alejandro, 664 F. Supp. 2d at 1340 (citations omitted); see also United States v. Pineda, No. 1:06-cr-350-WSD, 2008 WL 686239, at *10-11 (N.D. Ga. Mar. 10, 2008), adopted at *4 (finding collective knowledge of officers conducting wiretap surveillance of drug trafficking organization followed by the observations

of defendant actually engaging in activity expressed during the intercepted calls gave officers sufficient probable cause to search vehicle); <u>United States v. Jackson</u>, 548 F. Supp. 2d 1314, 1320-21 (M.D. Fla. 2008), adopted at 1317 (finding probable cause to search vehicle existed based on the information learned through the wiretap and earlier surveillance confirming information).  Because the traffic stop was lawful and Agarwal consented to the search orally and in writing and because there was independent probable cause to search his vehicle and the boxes therein, it is **RECOMMENDED** that Agarwal's motions to suppress, [Docs. 15 & 43], be **DENIED**.

### III.  CONCLUSION

For the foregoing reasons and cited authority, it is hereby **RECOMMENDED** that Agarwal's motions to suppress evidence, [Docs. 15 & 43], be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**IT IS SO ORDERED** and **RECOMMENDED**, this 6th day of April, 2018.

*Russell G. Vineyard*

RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE